# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

CLIFTON CRAWFORD,

                                        Plaintiff,

               v.                                        9:16-CV-252
                                                         (MAD/ATB)

D. KELLEY, CORRECTIONAL OFFICER,

                                        Defendant.

CLIFTON CRAWFORD, Plaintiff, pro se
LYNNE M. KNAPP BLAKE, Asst. Attorney General for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the
Honorable Mae A. D'Agostino, United States District Court Judge.  In this civil rights
complaint, plaintiff alleges that defendant Kelley forced plaintiff to work with
dangerous chemicals, without appropriate training or protection, and forced him to
work outdoors in harsh weather, without adequate clothing, and before eating breakfast,
in violation of the Eighth Amendment. (Complaint ("Compl.") at 12-21)[1] (Dkt. No. 1).
Plaintiff seeks substantial monetary relief. (Compl. at 21).

Presently before the court is the defendant's motion for summary judgment
pursuant to Fed. R. Civ. P. 56. (Dkt. No. 21).  Plaintiff has responded in opposition to
the motion. (Dkt. No. 28).  For the following reasons, this court agrees with defendant
and will recommend dismissal of the complaint.

---

[1] The court will cite to the pages assigned to the complaint by the court's electronic filing
system. (CM/ECF).

## I.    **Facts**

Plaintiff's complaint contains a variety of claims related to his work assignment as a "Building 74 Supply Porter." (*See generally* Compl.)  On March 31, 2016, the Honorable Mae A. D'Agostino conducted an initial review of the complaint.[2]  Judge D'Agostino's initial review resulted in the dismissal of various of plaintiff's claims.[3]  (Dkt. No. 7).  Corrections Officer Kelley is the only remaining defendant.  The surviving claims are:

> (1)    Plaintiff was subjected to cruel and unusual punishment when defendant Kelley required him to work with caustic chemicals without appropriate training or safety equipment.[4]

> (2)    Plaintiff was subjected to cruel and unusual punishment when defendant Kelley required him to deliver cleaning supplies to other buildings at the facility without proper winter clothing.

(*See* Dkt. No. 7 at 9-12).

It is undisputed that inmates are assigned to a particular work area by the Inmate Program Placement Committee ("IPPC") in accordance with the Department of Corrections and Community Supervision ("DOCCS") Directive No. 4803. (Carravetta[5]

---

[2] Plaintiff failed to comply with the filing fee requirements, and the case was administratively closed. (Dkt. No. 4).  The initial review was conducted after plaintiff submitted the appropriate documentation, and the case was reopened on March 16, 2016. (Dkt. No. 6).

[3] The court would point out that Judge D'Agostino dismissed plaintiff's other claims without prejudice to amendment.  However, plaintiff has not attempted to amend his complaint.

[4] Plaintiff also claimed that defendant Kelley improperly changed the duties involved in plaintiff's job so that he would be required to work with the caustic chemicals.  However, that claim was dismissed by Judge D'Agostino. (Dkt. No. 7 at 8-9).

[5] Although the Assistant Attorney General on the Docket Sheet is Lynn M. Knapp Blake, the individual who filed the summary judgment motion and who signed the declaration is Oriana Carravetta.  Thus, the court will cite to the Carravetta Declaration when appropriate.

Decl. Ex. A, Kelley Decl. ¶ 10, Pl.'s Dep. at 15). In this case, on January 26, 2015, the Program Committee assigned plaintiff to work as a "p.m. Bld. 74 Supply Porter" and "evening Bld. 54 Guidance Porter." (Compl. ¶ 6, Pl.'s Ex. A to Summary Judgment Motion - Dkt. No. 28-3 at 1). Plaintiff's Exhibit A is his "Program Card," signed by Brian O'Donnell. (*Id.*) Plaintiff claims that on January 26, 2015, he was told by Officer Latus, of Building 73B that defendant Kelley called to inform him that plaintiff was to report to work in the morning. (Compl. ¶ 6 at 4). Plaintiff then states that on February 5, 2015, defendant Kelly told plaintiff to do the "caustic run," which consisted of delivering the "caustic boxes" to the state shop, the laundry, the medical building, the gym, the service unit, and the weight room. (*Id.*)

Plaintiff states that after he made the "caustic run" on February 5, 2015, he told defendant Kelly that plaintiff's program card stated that he was assigned as a "p.m. Building 74 supply porter," and that the supply porter job did not involve working with caustic materials such as bleach and laundry detergent. However, defendant Kelley told plaintiff that his job was "whatever I tell you to do. . . ." (*Id.* at 5) Plaintiff alleges that defendant Kelley took it upon himself to change plaintiff's job description and require him to work with these caustic chemicals. (*Id.*) Plaintiff states that he was required to distribute laundry detergent and "Austin's A-1 bleach," in addition to a variety of other supplies, such as toilet paper, paper towels, soap, scouring pads, liquid hand soap, hand brushes, toilet brushes, and garbage bags to twenty five housing units. (*Id.*) Plaintiff was also required to "refill the caustic boxes with germicide, disinfectant, glass cleaner, neutral floor cleaner, and bathroom cleaner." (*Id.* at 5-6). Plaintiff claims that he was

3

not given any protective gear to guard against fumes or vapors.  Finally, plaintiff alleges that after his shift, he was required to "lounge" in the room which contained all of these caustic and irritating chemicals. (*Id.* at 6)  Plaintiff states that the room was 27' by 17', had very little ventilation, and had three "open urin[als]" in it." (*Id.*)

Plaintiff alleges that defendant Kelley's duties included supervising the supply room as well as the "caustic" room, in which all the chemicals, except the "Austin's A-1 Bleach" are stored. (Pl.'s Mem. of Law at 3) (Dkt. No. 28).  Plaintiff claims that it is the defendant's duty to know about the hazardous chemicals and to know what protective equipment "should be given to the worker." (*Id.*)  Plaintiff alleges that the "defendant" never had protective equipment in the caustic room, nor did defendant ever tell the plaintiff to use protective equipment or tell him where the protective equipment was stored. (*Id.*)

Plaintiff alleges that he began his work as a porter in Building 74 on January 26, 2015, and that on January 30, 2015, he went to "sick call" complaining that the chemicals in the caustic room were bothering him.  Plaintiff states that on February 2, 2015, he went back to the medical department to complain about the fumes from the toxic chemicals, and he was given a two-day work restriction. (*Id.*)  On February 19, 2015, plaintiff states that he saw Dr. Robert Lowenstein, who issued a Health Services Notification, stating that plaintiff should not work around caustic materials and should not lift more than twenty pounds. (*Id.* at 5, Pl.'s Exs. D-H, Dkt. No. 28-3 at 7-11)  As a result of the doctor's note, plaintiff was removed from his porter assignment as of February 19, 2015.

Plaintiff also claims that as part of his job, he was required him to deliver materials, including caustic materials, to other parts of the facility. This part of his job involved going outdoors to other buildings. Plaintiff claims that he was not properly dressed to make these deliveries because of the intense cold and deep snow in January and February of 2015. Plaintiff blames defendant Kelley for the lack of proper winter clothing. Plaintiff has submitted the weather records for the time in question.[6] (Pl.'s Ex. P) (Dkt. No. 28-3 at 38-59).

## II.    Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts

---

[6] There is generally no dispute that it is cold in Upstate New York in January and February.

showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III. <u>Conditions of Confinement</u>

### A. Legal Standards

The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Prison officials "must 'take reasonable measures to guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to

6

constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835.

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Carlson v. Parry*, No. 06-CV-6621, 2012 U.S. Dist. LEXIS 44292, at *20–21, 2012 WL 1067866 (W.D.N.Y. Mar. 29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[] sufficient to satisfy the subjective component of the deliberate-indifference standard. *Id.* (citing *Farmer*, 511 U.S. at 842; *Proffitt v. Ridgeway*, 279 F.3d 503, 506 (7th Cir. 2002); *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett*, 379 F.3d at 465 (citing *Fruit v. Norris*, 905 F.2d 1147, 1150–51 (8th Cir. 1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show

that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id*. at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

### B. Application

### 1. Seriousness of Deprivation

Plaintiff alleges that defendant Kelley violated his right to be free from cruel and unusual punishment when he required plaintiff to work with toxic chemicals without proper safety equipment and when he forced plaintiff to make his deliveries without proper winter clothing. Various courts in this circuit have been presented with claims in which inmates allege Eighth Amendment claims based upon the exposure to toxic chemicals or harmful environmental or working conditions. *See e.g. Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (dangerous ladder); *Banks v. Stewart*, No. 08 Civ. 7463, 2010 WL 2697075 (S.D.N.Y. July 6, 2010) (meat slicer); *Jackson v. Goord*, 664 F. Supp. 2d 307, 320 (S.D.N.Y. 2009) (prolonged exposure to toxic materials without adequate safety equipment); *Vann v. Donnelly*, No. 00-CV-911, 2005 WL 246810 (W.D.N.Y. Feb. 1, 2005) (asbestos and crystalline silica).

In *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993), the Supreme Court held that, in the context of exposure to second-hand smoke, the Eighth Amendment protection extends to conditions that threaten to cause health problems in the future in addition to those that cause current problems.  However, in order to meet the objective prong of the Eighth Amendment analysis, the plaintiff must "come forward with some evidence from which a reasonable jury could find that the risk to his health is sufficiently serious and 'not one that today's society chooses to tolerate.'" *Islam v. Connolly*, No. 07 Civ. 3225, 2011 WL 723568, at *3 (S.D.N.Y. Feb. 16, 2011) (quoting *Helling*, 509 U.S. at 36).

In *Islam*, the court found that the plaintiff's exposure to second-hand smoke did not rise to the level that a reasonable jury could find "so grave" that it violated contemporary standards of decency to expose "*anyone*" unwillingly to such a risk. *Id.* at *3 (quoting *Helling*, 509 U.S. at 36) (emphasis in original); *Zaire v. Artuz*, No. 99 Civ. 9817, 2003 WL 230868, at *5 (S.D.N.Y. Feb. 3, 2003) (granting summary judgment to defendants where plaintiff was exposed to second-hand smoke primarily in common areas for five months); *Griffin v. DeRosa*, 153 F. App'x 851, 853 (3d Cir. 2005) (affirming dismissal of plaintiff's claim that he was exposed to eight to ten inmates smoking every time he went to the restroom over a twenty month period)).  *See also Konovalchuk v. Cerminaro*, No. 9:11-CV-1344, 2014 WL 272428, at *20 (N.D.N.Y. Jan. 24, 2014) (granting summary judgment - distinguishing *Colon v. Drew*, 335 F. App'x 86, 89 (2d Cir. 2009) (reversing grant of summary judgment based on qualified immunity where defendant did not show that plaintiff's sensitivity to second-hand smoke could not have been accommodated without jeopardizing security)).  The

success or failure of these actions on motions for summary judgment have depended largely on the facts surrounding the exposure to the toxic substance.

Plaintiff in this case has brought two prior actions involving exposure to toxic substances. *Crawford v. Artuz*, 143 F. Supp. 2d 249, 257-61 (S.D.N.Y. 2001) (exposure to asbestos); *Crawford v. Coughlin*, 43 F. Supp. 2d 319 (W.D.N.Y. 1999) (exposure to toxic fumes and chemicals in the Metal Shop at the Corcraft Facility at Attica Correctional Facility). At his deposition in this action, plaintiff testified that he settled the Metal Shop case for $25,000.[7] (Pl.'s Dep. at 63-64). In *Crawford v. Coughlin*, plaintiff made very similar claims regarding the defendants' failure to provide him with the proper respiratory safety equipment and instruction when he worked at Corcraft in various positions, including as a spray painter. 43 F. Supp. 2d at 322-23, 325-26. The court denied the defendants' motion for summary judgment, finding that questions of fact remained as to whether plaintiff was provided safety equipment, and defendants were not entitled to qualified immunity because there was a clearly established right to be protected from future harm. *Id.* at 326.

In this case, plaintiff alleges that he was exposed to toxic fumes from the chemicals that affected his health. Plaintiff started working as a supply porter on January 26, 2015, and on January 30, 2015, he saw a nurse to complain about the fumes. By February 2, 2015, plaintiff had already seen a physician, and was given a two day leave from the job. Plaintiff returned to his job assignment, but by February

---

[7] The case was settled after the court granted summary judgment for some of the defendants based on a lack of personal responsibility, but denied summary judgment based on defendants' qualified immunity argument. *Crawford v. Coughlin, supra.*

19, 2015, he was removed from the job, based on the Dr. Lowenstein's note regarding plaintiff's potential exposure to chemicals and a newly-discovered lifting restriction.

The delay in taking plaintiff out of the assignment was due to Dr. Lowenstein's request for information regarding the particular job. (Dkt. No. 28-3 at 9) (Pl.'s Ambulatory Health Record ("AHR")).  On February 3, 2015, Dr. Lowenstein indicated on the AHR that he had asked whether the plaintiff was exposed to chemicals and fumes or whether the chemicals were stored in sealed containers. (*Id.*)  Dr. Lowenstein also asked about the lifting requirements of the job. (*Id.*)  By February 19, 2015, plaintiff had been removed from the position based on Dr. Lowenstein's "Program Notification." (Dkt. No. 28-3 at 11).  Plaintiff only worked at the porter assignment for 24 days. (Compl. ¶ 6 at 4).

Plaintiff has submitted an affidavit from a co-worker, who states that "on Wednesday twice a month," plaintiff was assigned to deliver laundry detergent and bleach to all the housing units.  When he returned to the supply room, he was required to refill the "caustic" containers with germicide, bathroom cleaner, and floor cleaner. (Rabb Aff. ¶¶ 4-6).  Mr. Rabb also states that on Tuesdays and Thursdays, plaintiff delivered toilet paper and paper towels (Tuesday) and soap, scouring pads, hand soap, toilet brushes or hand brushes, garbage bags, and "various officer administrative forms and supplies" (Thursday). (Rabb Aff. ¶¶ 7-8).  Mr. Rabb states that when he and Mr. Crawford were working with the bleach, they were not given any type of protective gear or respirators. (Rabb Aff. ¶ 5).  However, it appears that plaintiff was only working with the bleach on Wednesdays "twice a month."  Since plaintiff only worked

in this job for 24 days, Mr. Rabb implies that plaintiff only handled and/or delivered bleach twice during the entire time that he worked as a porter.

In contrast, in *Crawford v. Coughlin*, plaintiff worked in the Metal Shop at Attica for approximately three years. *Crawford v. Coughlin*, 43 F. Supp. 2d at 322. Plaintiff's risk of future injury is significantly less from his alleged exposure in the current case. Although plaintiff alleges in his response to defendant's motion that his vision loss advanced more quickly, causing him to have his cataracts removed, the medical evidence that plaintiff submits does not support this assertion.

Plaintiff's medical records indicate that laser eye surgery (selective laser trabeculoplasty - "SLT") was approved for plaintiff's glaucoma, but not scheduled on January 20, 2015, approximately six days before he even started working as a porter. (Dkt. No. 28-3 at 7 - AHR entry dated 1/20/15). Plaintiff had surgery on both eyes on March 12, 2015. No glaucoma drops were prescribed, and a follow up was scheduled for one month. (*Id.*) Plaintiff has submitted the medical records relative to his cataract surgery, which did not occur until February of 2016, almost one year later.[8] Whatever "exposure" he suffered to cleaning chemicals and fumes ended on February 19, 2015. Plaintiff's medical records indicate that his cataract problems started "a few years ago," and had "steadily worsened" to the point where plaintiff was requesting that his cataracts be removed. It is hard to imagine that the cataracts were made worse or

---

[8] In his memorandum of law, plaintiff cites the "Toxicity Data" for the Austin A-1 Bleach. (Dkt. No. 28-2 at 8). These effects include eye burns, eye irritation, skin burns, and lung irritation and damage from "prolonged or repeated overexposure." The eye damage to which plaintiff refers is if the bleach actually gets in your eyes. Plaintiff does not allege that bleach got in his eyes. He was complaining about fumes. In any event, there is absolutely no evidence that plaintiff had to have his cataracts removed due to the exposure to chemicals.

developed more quickly as a result of plaintiff's alleged exposure to fumes from the cleaning chemicals, including the A-1 Bleach.

In the case in which plaintiff and a co-plaintiff were alleging dangerous exposure to asbestos, the court held that even if plaintiffs could have established a serious risk of future injury, their claims would not survive summary judgment because, given the evidence provided, they had failed to assert a risk that was "'so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" *Crawford v. Artuz*, 143 F. Supp. 2d at 260-61 (quoting *Helling*, 509 U.S. at 36) (emphasis in original). The same is true in this case. The fact that plaintiff ultimately had cataract surgery is not determinative. In *Crawford v. Artuz*, the court held that an injury's "mere temporal proximity to asbestos exposure does not mean that the injury was caused by asbestos." *Id.* (footnote omitted).

It was clear in *Crawford v. Artuz* that plaintiff had not suffered an asbestos-related injury because the defendants presented medical evidence, substantiating their argument. In this case, it is clear that plaintiff does not suffer any injuries related to the alleged exposure to toxic chemicals because, other than his alleged cataracts, plaintiff has asserted no residual damage from the exposure. The relatively short duration of plaintiff's exposure, and the speed at which he was removed from the program after Dr. Lowenstein indicated that his medical condition would not be compatible with its requirements (including lifting), shows that plaintiff was not exposed to a risk that was "'so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" Thus, plaintiff has failed to raise a genuine issue of fact

with respect to the objective prong of the Eighth Amendment test.

With respect to the issue of proper winter clothing, plaintiff testified at his deposition that when he made his deliveries, he wore a "state coat," a "state sweatshirt," regular state pants, socks, and medical boots. (Pl.'s Dep. at 90-91). Plaintiff testified that he needed winter gloves and a hooded sweatshirt to go underneath his jacket. (Pl.'s Dep. at 92). Plaintiff alleges that he asked defendant Kelley for the extra clothing because defendant Kelley had obtained extra clothing for inmates who held the job prior to plaintiff. (Pl.'s Dep. at 93). Plaintiff testified that he asked for the clothing three or four days after he began working as a porter. (Pl.'s Dep. at 93-94). Plaintiff claimed that he asked defendant Kelley when plaintiff was going to get the "extra clothing" that he had given the other inmates who delivered caustics, but that Kelley did not respond. (*Id.*) Plaintiff claimed that he could not ask anyone else for extra clothing because that would be "out of order." (Pl.'s Dep. at 94-95).

However, plaintiff testified that he always went outdoors in his state-issued jacket and was never outdoors in a short-sleeved shirt or short pants. (Pl.'s Dep. at 99). His skin was never exposed to the elements. (*Id.*) Given plaintiff's testimony, even assuming that defendant Kelley did not give him "extra" clothing, the court finds that plaintiff has failed to allege a condition that would present an unreasonable risk to plaintiff's health. Plaintiff was never outdoors without some form of outer wear. The fact that plaintiff wished to have an additional layer for the short time that he was delivering his supplies to other buildings does not meet the objective prong of the Eighth Amendment test.

## 2.    Deliberate Indifference

As to the subjective prong, plaintiff must show that the defendant acted with a sufficiently culpable state of mind.  In this case, defendant Kelley has submitted an affidavit, stating that he is not in charge of programming for inmates,[9] and his duties at Mohawk during the time in question included "but were not limited to," supervising the Building 74 Basement Supply Room and the inmates who were assigned to work there as "basement supply porters." (Kelley Decl. ¶ 7).  Defendant Kelley states that the duties of these porters include "distribution of caustic supplies and other supplies (including toilet paper, paper towels, toothpaste, soap, scouring pads, garbage bags, etc.) to housing units and other areas of the facility. (*Id.*)  Defendant Kelley also states that caustic supplies are maintained in the Building 74 supply room, and that these materials include: "Corcraft Germicidal Cleaner 128; Green Line Bathroom Cleaner Concentrate; CorrectPAc pH Neutral Floor Cleaner No. CP1803; Green line Liquid Laundry Detergent; CorCraft Glass Cleaner; CorCraft Floor Wax Remover; and Austin A-1 Bleach Commercial Disinfectant Sanitizer." (Kelley Decl. ¶ 8).

Defendant Kelley states that each supply container in the supply room contains a Material Safety Data Sheet ("MSDS") which lists the exposure controls and personal protection guidelines. (*Id.*)  MSDS lists are located in all areas where hazardous chemicals/materials are stored and in areas where they are used daily pursuant to DOCCS Directive No. 4067. (*Id.* & Ex. A, DOCCS Directive No. 4607(F).  Defendant

---

[9] In fact, defendant Kelley states that inmates are assigned to a particular job and work area by the IPPC, in accordance with DOCCS Directive No. 4803 - Inmate Program Placement. (Kelley Decl. ¶ 10).  Defendant Kelley states that he is not on the IPPC, has no authority to change an inmate's job assignment, and had no involvement in the plaintiff's assignment to the porter job. (*Id.*)

Kelley states that the Building 74 Supply Room is approximately 30' by 50', not 27' by 17' as plaintiff and Mr. Rabb claim, and has a window with an exhaust fan in it. (Kelley Decl. ¶ 11). The inmates have the discretion to turn on and off the fan when they wish. In addition, the door to the room is kept open for ventilation in addition to security. (*Id.*)

DOCCS Directive No. 4067 provides guidelines for the safe use and storage of hazardous materials. (Kelley Decl. ¶ 12 & Ex. A). The directive specifically states that hazardous materials should only be used by staff and inmates who have had a "documented" training in the safe use, storage, and disposal of the materials. (Kelley Decl. ¶ 12). Inmates who use hazardous materials should do so under staff supervision. (*Id.*) The MSDS indicates whether protective equipment is needed to handle the particular product, and if so, the appropriate protective gear is supplied to the inmates as stated in DOCCS Directive No. 2121.[10] (Kelley Decl. ¶ 12 & Ex. B). It is the supervisor's responsibility to see that the personal protective equipment is in working order and is responsible for requesting replacement equipment if necessary. (DOCCS Directive No. 2121(B) (citing Directive No. 2121(E) & (F). Subsections E and F specifically state that it is also the responsibility of the employee (the individual who is using the equipment) to inspect and to request replacement of malfunctioning or worn equipment before performing the task in which the protective equipment is needed. (Directive No. 2121(F).

Defendant Kelley acknowledges that he was responsible for maintaining the

---

[10] DOCCS Directive 2121(IV)(B).

personal protection gear and making it available to the inmates who work in the supply area. (Kelley Decl. ¶ 14). Defendant Kelley states that all products in the supply room are labeled with Personal Protective Equipment stickers, indicating what type of protective gear is needed to handle the product. This protective equipment is kept in an unlocked cabinet in the Building 74 supply room, and any person assigned to the area has unlimited access to the cabinet and the protective equipment. However, "[n]one of the supplies contained in the supply room require the use of respiratory gear."[11] (*Id.*)

Plaintiff was assigned by the IPPC to the jobs of Building 74 Supply Porter and Building 54 Evening Guidance Porter. (Kelley Decl. ¶ 17). Defendant Kelly has submitted a form, signed by plaintiff on September 16, 2010, which lists the equipment and cleaning supplies that plaintiff was trained to use for the Building 74 Supply Porter job.[12] The form indicates that plaintiff was trained to use the standard speed floor machine, the ultra high speed floor machine, ready-mix glass cleaner, germicide 128, neutral floor cleaner, and heavy duty decrease cleaner. (Kelley Decl. Ex. C).

Plaintiff disputes almost every statement made by defendant Kelley about the

---

[11] This assertion does not appear to be correct. Plaintiff has supplied the MSDSs for the cleaning chemicals in question, and the information regarding the A1 Bleach indicates that one should "use suitable respiratory equipment in case of inadequate ventilation." (Dkt. No. 28-3 at 20). In addition, the MSDS indicates that "prolonged or repeated overexposure may cause lung damage." (Dkt. No. 28-3 at 21). The bleach is also an eye irritant and caused eye and skin burns with contact. (*Id.*) The MSDS recommends "chemical splash goggles, neoprene gloves, NIOSH approved respirator, [and] apron." (*Id.* at 20). While defendant alleges that the ventilation was adequate in the supply room, plaintiff disputes this statement. Although this is an error by defendant, because the plaintiff's exposure does raise factual issues regarding the objective prong of the Eighth Amendment test, the defendant's error does not affect this court's recommendation.

[12] Clearly, the 2015 job was not the first time that plaintiff had been assigned to be a porter since the training form was dated in 2010. Plaintiff admitted at his deposition that he had been a porter on many previous occasions while incarcerated at DOCCS. (Pl.'s Dep. at 18).

room, the plaintiff's duties, the training, and the protective equipment. (Dkt. No. 28).

Plaintiff testified that he only remembered being trained on one of the floor machines

and the germicide 128, and that, when he signed the "Record of Training," the prison

officials made him sign a blank form which was filled in at a later date. (Pl.'s Dep. at

19-22, 29-31). Plaintiff claims that he was never told where to find any protective gear,

nor was there gear available, and the fan was never turned on in the room. (Pl.'s Dep. at

39-55).

However, plaintiff also conceded that defendant Kelley had no way of knowing

plaintiff's particular medical problems until plaintiff mentioned the problems himself

because that information was "confidential." (Pl.'s Dep. at 74). Defendant Kelley

stated that he had no knowledge of plaintiff's medical history. (Kelley Decl. ¶ 27).

Defendant Kelley honored plaintiff's medical restrictions when he was presented with

them. (Kelley Decl. ¶ 20-22). Defendant Kelley also stated that the supply room had a

window with an exhaust fan, which could be turned on at the inmates' discretion.

(Kelley Decl. ¶ 11). Most of the cleaning supplies required either goggles, gloves, or

both, depending on whether the chemical was full-strength or diluted. (*Id.*)

Kelley confirmed that, if an inmate had trouble breathing or was experiencing

eye irritation, he would be sent to sick call. (Kelley Decl ¶ 25). Plaintiff's own

activities confirm that this is true. Plaintiff claims that he started having trouble with

the chemicals two days after he started working, and by January 30, 2015, he had seen

the nurse and was scheduled for a visit with the doctor. Plaintiff saw Dr. Lowenstein,

who asked for more information about the job that plaintiff was doing. Defendant

Kelley had no authority to change plaintiff's program. It was reasonable for the doctor to check on the job requirements to make sure that he was recommending the appropriate solution to plaintiff's problem. By February 19, 2015, plaintiff had been removed from the program.

Plaintiff alleges that the porter job never included working with or transporting these caustic substances. Defendant states that the porter's job has always involved delivering and handling these materials. Regardless of these disputed facts, there is no indication that defendant Kelley acted with the requisite state of mind for an Eighth Amendment violation. In his complaint, plaintiff alleges that he only told defendant Kelley that plaintiff believed that the porter's job did not involve transporting these materials, and defendant Kelley allegedly told plaintiff that his job was what defendant Kelley told him to do. Even if that is true, plaintiff does not claim that defendant Kelley knew about his medical condition when Kelley told plaintiff to perform the work that Kelley believed was part of the porter's job.

At his deposition, plaintiff's testimony was slightly different. Plaintiff claimed that he "explained" his medical problem with the chemicals to defendant Kelley, and then defendant Kelley made him perform the work. However, that version is not supported by any of the evidence, given that plaintiff complained to a nurse only four days after he started the job, and he was scheduled to see a doctor within a week after he started. When the doctor determined that plaintiff should not be working with the chemicals he was immediately removed from the program. Kelley had no authority to remove him from the position until the doctor confirmed that he should not be working.

Defendant Kelley also received plaintiff's Record of Training, indicating that he had been trained on the handling of various cleaning supplies. (Kelley Decl. Ex. C). Even assuming that plaintiff signed a blank form in 2010 as he claims, that would not affect defendant Kelley's ability to rely on the form in 2015.

Finally, the complaint may also be dismissed with respect to plaintiff's claim that defendant Kelley did not provide him proper clothing for the deliveries that required plaintiff to go outside in the winter. First, plaintiff simply wished to have heavier clothing. Plaintiff testified that when he went outdoors in the winter he wore his winter coat, his long pants, and his medical boots. (Pl.'s Dep. at 90-91). In addition, it is clear that defendant Kelley was not in charge of obtaining extra clothing for inmates. If the inmates wish to obtain extra clothing, they complete a form 1670 and request the clothing that they believe they require.

In support of the motion for summary judgment, defendant has filed the declaration of Roxanne Labelle-Fischer, Office Assistant II at Mohawk. (Labelle-Fischer Decl. ¶ 1) (Dkt. No. 21-5). Ms. Labelle-Fischer's duties include maintaining inventory for all incoming and issued clothing to inmates at Mohawk and Walsh Medical Center. (Labelle-Fischer Decl. ¶ 4). She ensures that all inmates have the "standard" issue clothing, footwear, and outerwear. (*Id.*) She also maintains the inmate's clothing cards, which contain a record of all the clothing items issued to the inmates throughout their time in DOCCS custody. (*Id.*)

If an inmate wants an additional item of clothing, he must submit a request form, and once the request is satisfied, it is noted on the "Male Inmate Clothing Record," or

20

Form #1670. (Labelle-Fischer Decl. ¶ 5). Ms Labelle-Fischer maintains the Form

#1670 records. (*Id.*) Ms. Labelle-Fischer states that she searched the records of #1670

forms maintained at Mohawk in January or February of 2015. (Labelle-Fischer Decl.

¶ 6). The search revealed that plaintiff received a pair of underwear in January 2015

and a winter coat in February of 2015. (Labelle-Fischer Decl. ¶ 7). She also states that

"a Correction Officer does not have the authority to come into the State Shop or to

request or obtain clothing on an inmate's behalf." (Labelle-Fischer Decl. ¶ 8).

Plaintiff's testimony that he was unaware of the procedure by which to obtain

additional clothing or that somehow defendant Kelley was responsible for obtaining

plaintiff more winter clothing, is therefore, inconsistent with the records showing that

he did receive a winter coat in February of 2015, during the time that he states

defendant Kelley was making him deliver cleaning supplies in improper winter gear. In

fact, as stated above, plaintiff conceded at his deposition that he wore a sweatshirt and a

winter coat at the same time when he made his deliveries. (Pl.'s Dep. at 90-91).

"While it is undoubtedly the duty of district courts not to weigh the credibility of

the parties at the summary judgment stage, in the rare circumstance where the plaintiff

relies almost exclusively on his own testimony, much of which is contradictory and

incomplete, it will be impossible for a district court to determine whether 'the jury

could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine"

issues of material fact, without making some assessment of the plaintiff's account."

*Jeffery v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Plaintiff has failed to

rebut the showing that he had constitutionally sufficient winter clothing for his job and

that, in any event, defendant Kelley would not have been responsible for obtaining the clothing for him.  Thus, plaintiff's claim may be dismissed.

As stated above, defendants have shown that there is no question of fact regarding the objective prong of the Eighth Amendment test, and even if there are disputed questions of fact regarding the subjective prong, these questions are not "material," under the circumstances of this case, and this court recommends granting summary judgment in favor of the defendant.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant Kelley's motion for summary judgment (Dkt. No. 21) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 27, 2017

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**